Submitted July 6, conviction on Count 1 reversed, remanded for entry of a conviction on Count 3 and for resentencing, otherwise affirmed August 9, 2023

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CHARLES RANDAL PITTS,
aka Charles Randall Pitts,
*Defendant-Appellant.*

Multnomah County Circuit Court
19CR40942; A176685

535 P3d 349

Defendant was found guilty of two counts of interfering with public transportation (IPT), ORS 166.116 (Counts 1 and 3), based on conduct involving a TriMet bus. The two verdicts were merged into a single conviction on Count 1. On appeal, defendant assigned error to the denial of his motion for judgment of acquittal on Count 1, which pertained to a verbal altercation with the bus driver inside the bus. As relevant to Count 1, a person commits the crime of IPT under ORS 166.116 (1)(c) if the person, "[w]hile in or on a public transit vehicle or public transit station, engages in disorderly conduct in the second degree as defined in ORS 166.025[,]" and second-degree disorderly conduct includes engaging in "violent, tumultuous or threatening behavior." *Held*: The trial court erred in denying the motion for judgment of acquittal on Count 1, because the evidence was legally insufficient to prove that defendant engaged in "violent, tumultuous or threatening behavior" in the bus.

Conviction on Count 1 reversed; remanded for entry of a conviction on Count 3 and for resentencing; otherwise affirmed.

Amy M. Baggio, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Nora Coon, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Colm Moore, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, and Joyce, Judge, and Jacquot, Judge.

AOYAGI, P. J.

Conviction on Count 1 reversed; remanded for entry of a conviction on Count 3 and for resentencing; otherwise affirmed.

**AOYAGI, P. J.**

Defendant was found guilty of two counts of interfering with public transportation (IPT), ORS 166.116 (Counts 1 and 3), based on an incident involving a TriMet bus.[1] The trial court merged the guilty verdicts, resulting in a single conviction on Count 1. On appeal, in his sole assignment of error, defendant challenges the denial of his motion for judgment of acquittal (MJOA) on Count 1. We agree with defendant that the evidence was legally insufficient to find him guilty on Count 1. Accordingly, we reverse the conviction on Count 1 and remand for entry of a conviction on Count 3.

On review of the denial of a motion for judgment of acquittal, our task is to examine the evidence "in the light most favorable to the state to determine whether a rational trier of fact, accepting reasonable inferences and reasonable credibility choices, could have found the essential element of the crime beyond a reasonable doubt." *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995).

As relevant to Count 1, a person commits the crime of IPT under ORS 166.116(1)(c) if the person, "[w]hile in or on a public transit vehicle or public transit station, engages in disorderly conduct in the second degree as defined in ORS 166.025[.]" Here, the state alleged that, while "in" a TriMet bus, defendant engaged in disorderly conduct in the second degree as defined in ORS 166.025(1)(a), *i.e.*, that "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof," he "[e]ngage[d] in fighting or in violent, tumultuous or threatening behavior."

There is no statutory definition of "violent, tumultuous or threatening behavior." *State v. Atwood*, 195 Or App 490, 495, 98 P3d 751 (2004). However, in case law, we have narrowly construed that language so as not to infringe on constitutionally protected speech. *State v. Hosley*, 282 Or App 880, 883, 388 P3d 387 (2016) ("Over the past 30 years, our cases applying ORS 166.025(1)(a) have construed that statute in a manner that will not infringe upon constitutionally

---

[1] Defendant was also charged with one count of menacing, ORS 163.190 (Count 2), but that count was dismissed on the state's motion before trial.

protected speech."). To engage in "violent, tumultuous or threatening behavior," a person must either use physical force or engage in physical conduct immediately likely to result in the use of physical force:

> "The expressed intent of the legislature is to proscribe behavior amounting to a breach of the peace. *** We construe the terms 'fighting,' 'violent,' 'tumultuous,' and 'threatening' to have their commonly understood referents to physical force. We hold that ORS 166.025(1)(a) makes unlawful only the use of physical force or physical conduct which is immediately likely to produce the use of such force and which is intended to create or recklessly creates a risk of public inconvenience, annoyance or alarm."

*State v. Cantwell*, 66 Or App 848, 853, 676 P2d 353, *rev den*, 297 Or 124 (1984).

In other words, ORS 166.025(1)(a) criminalizes only physical conduct, not speech. "A person's speech may provide circumstantial context for determining whether or not the person's conduct was 'immediately likely to result in physical force,' but ORS 166.025(1)(a) does not reach 'conduct that is *itself* speech' or that is 'primarily speech.'" *Hosley*, 282 Or App at 883 (quoting *State v. Richardson*, 277 Or App 112, 118-19, 370 P3d 548 (2016) (emphasis in original)); *see also, e.g.*, *State ex rel Juv. Dept. v. Krieger*, 177 Or App 156, 160-61, 33 P3d 351 (2001) ("We find nothing in youth's physical acts, separate from his speech, that constitutes the sort of physical force or physical conduct likely to produce such force that the disorderly conduct statute prohibits.").

Here, the incident at issue took place when defendant sought to ride a TriMet bus. After loading his bicycle onto the bus's exterior rack, defendant boarded the bus, placed a weedwhacker that he was carrying on a seat near the middle of the bus, then returned to the front of the bus and paid his fare. The driver asked defendant to remove a pair of gardening shears that were bungee-corded to his bicycle, as they were at risk of falling off. Defendant started down the stairs to exit the bus, then came back up. He "immediately snapped" and started arguing with the driver in a "raised" voice that was "very aggressive" but not

"necessarily yelling."[2] He was standing "maybe two feet" from the driver, near the fare box and behind a yellow railing that separated the driver's seat. A video shows defendant leaning slightly forward while speaking and emphatically pointing his finger toward the ground several times. The driver understood defendant to be upset about the driver "telling him what to do" and "looked at it as TriMet is controlling him." Defendant was saying "something about TriMet" and "was complaining about them." Although defendant did not say anything threatening, the driver immediately felt concerned for his personal safety, because he had never had a passenger react like that. The driver wasn't "necessarily scared" but was "very intimidated," and "it was pretty uncomfortable."[3]

Defendant argued with the bus driver for approximately 10 seconds, and then exited the bus to comply with his request. The driver closed the bus door and called dispatch. Once he had the gardening shears off his bike, defendant sought to reboard the bus, but the driver kept the door closed and would not let him in. Defendant stood outside the closed door, then went around the front of the bus and, for approximately 10 to 15 minutes, stood or sat in a manner that prevented the bus from leaving (as well as yelling and gesturing at the driver). At some point, the bus driver removed defendant's weedwhacker from the bus and placed it on the curb. Also at some point, defendant, who was "very agitated," "t[ook] one of the shears off and was like threatening to hit the bus or me or whatever through the window."

The trial court relied heavily on defendant's shear-waving outside the bus in denying the MJOA on Count 1.

_____

[2] The bus driver initially referred to defendant "yelling" at him, but, when asked specifically about the volume of defendant's voice while on the bus, the driver clarified, "I wouldn't say he was necessarily yelling at me at the time, but it was raised, very aggressive."

[3] The driver, who had worked for TriMet for nearly seven years, testified:

"Q: Did the Defendant threaten you at all while on the bus?

"A: Not on the bus, no. Not on the bus.

"Q: Did you ever feel in danger of your personal safety?

"A: I did almost immediately, because I've never had a response like that. I wouldn't say I was necessarily scared, but it—I felt very intimidated, and I was by myself. So yeah, it was pretty uncomfortable."

However, defendant argues, and the state implicitly concedes, that defendant's conduct outside the bus is not relevant to Count 1, because ORS 166.116(1)(c) is limited to disorderly conduct "in or on a public transit vehicle," and Count 1 charged defendant with disorderly conduct "in a public transit vehicle." We agree and therefore limit our analysis to defendant's conduct inside the bus.[4]

Defendant's conduct inside the bus was primarily speech, and we agree with defendant that the nonspeech aspect of his conduct was legally insufficient to qualify as "violent, tumultuous or threatening behavior" under the standard articulated in *Cantwell*. Defendant did not make physical contact with the driver or otherwise use any physical force while inside the bus. There also is no evidence that the driver or anyone else was "immediately likely" to use physical force against defendant in response to defendant's conduct inside the bus. *See Atwood*, 195 Or App at 498 (leaving open whether *Cantwell's* standard of "immediately likely to produce the use of [physical] force" refers only to physical force immediately likely to be used by "the defendant himself or herself" or also encompasses physical force that is immediately likely to be used by the object of the defendant's conduct or by a witness to it (brackets in original)); *see also State v. Wade*, 278 Or App 669, 673, 377 P3d 660 (2016) (noting that that question remains open but that it need not be resolved until a case arises in which it would affect the outcome).

Thus, the only question here is whether the evidence was legally sufficient to establish that *defendant* was "immediately likely" to use physical force against the bus driver. We conclude that it was not. There was certainly ample evidence that defendant was angry about the request that he

---

[4] In denying the MJOA on Count 1, the trial court expressly cited the evidence that defendant had "raised the shears and acted in a way that the driver interpreted as a threat to smash the window," which the court described as being "not speech" but "conduct" and "conduct sufficient for the State to satisfy its burden at the MJOA stage." Shortly thereafter, defendant reminded the court that the disorderly conduct had to occur "in or on a bus, not near a bus," as relevant to the MJOA, but the court did not reconsider its ruling. The court did ultimately instruct the jury, however, that, as to Count 1, the state had to prove that defendant was "in or on a public transit vehicle while engaging in disorderly conduct." The state does not contend that there is any preservation issue, and we are satisfied that the principles of preservation were adequately served.

remove the gardening shears from his bicycle and that he expressed that anger by arguing loudly with the driver in an aggressive manner. The angry interaction inside the bus was brief, however, and defendant exited the bus before anything occurred that would allow a finding that defendant was "immediately likely" to use physical force against the bus driver.

This case is unlike prior cases in which we have held that sufficient evidence existed to prove "violent, tumultuous or threatening behavior" for purposes of ORS 166.025(1)(a). For example, in *State ex rel Juv. Dept. v. Saechao*, 167 Or App 227, 234, 236-37, 2 P3d 935, *rev den*, 331 Or 283 (2000), the youth joined a group of boys to threaten and surround the victim, preventing the victim's escape while another boy attacked him. In *State v. Davies*, 195 Or App 534, 536-37, 98 P3d 757 (2004), the defendant aggressively and physically confronted store employees who had asked him to leave, including poking or hitting an employee in the chest and striking one or more employees, after which "[a] fracas ensued, resulting in various injuries to several employees." And, in *State v. Miller*, 226 Or App 314, 316-18, 203 P3d 319 (2009), the defendant kicked a three-foot-high metal sign with enough force to send it flying from the sidewalk into the middle of a four-lane road.

By contrast, we have reversed convictions for second-degree disorderly conduct where the evidence was insufficient to prove "violent, tumultuous or threatening behavior." No prior case has had similar enough facts to be directly analogous to this one, but the present situation has at least some similarities to *Atwood*.

In *Atwood*, the district secretary at a school told the defendant's daughter that she needed to "improve[ ] her attitude" if she wanted to use the phone in the school office to call home after missing the bus. 195 Or App at 492. The defendant soon came to the school office and demanded to see both the district secretary and the principal. *Id*. at 493. The defendant and the principal ended up talking outside the closed office door, while the receptionist and the district secretary hid inside the office. *Id*. The defendant "appeared upset," expressed his concern about the district secretary,

and asked to see her. *Id*. The principal went into the office alone, then returned and lied that the district secretary was gone for the day. *Id*. At that point, the defendant "blew up" and "became very agitated and upset." *Id*. He "brought up his fists" and pointed his finger at the principal, and he stated in a "loud" voice that he "was going to take off [the district secretary's] head and shit down her throat." *Id*. The principal was concerned for his staff's safety; he also was concerned that, if the district secretary came out of the office, his own safety and that of others "would have been in jeopardy." *Id*. The principal asked the defendant to leave. *Id*. As he left, the defendant turned and, "at the top of his lungs," screamed, "You let her know I'm going to rip off her fucking head and shit down her throat." *Id*. at 493-94. Several teachers came out of their classrooms to see what was happening, and much of the school business was halted for the day. *Id*. at 494.

The defendant in *Atwood* was charged with menacing and second-degree disorderly conduct. *Id*. As relevant here, he moved for a judgment of acquittal on the disorderly conduct count that was based on "tumultuous and threatening behavior," and the trial court denied the motion. *Id*. at 494-95. We reversed. Considering the totality of the circumstances, we held that the defendant's physical conduct (raising his fists and pointing his finger at the principal)—considered in the context of his "angry affect, the source of that anger, and his statement"—was "insufficient to support a finding that defendant had engaged in physical conduct that was immediately likely to produce the use of physical force by defendant." *Id*. at 499 (internal quotation marks and brackets omitted).

This case differs from *Atwood* in some regards. A difference that favors the state is that, in *Atwood*, the defendant was primarily angry at the district secretary, who was behind a closed door and out of sight, whereas, in this case, defendant was angry with TriMet and the bus driver in front of him as a representative of TriMet. Defendant's anger was therefore at least somewhat more directed at the bus driver personally than the *Atwood* defendant's anger was directed at the principal. There are also differences, however, that favor defendant. Whereas the *Atwood* defendant put up his

fists, pointed his finger at the principal, and screamed at the top of his lungs a threat of physical violence, defendant in this case did not put up his fists, scream, or make any verbal threats.

On the whole, although no existing published case has facts closely similar to this one, this case is more in line with *Atwood* than it is with the cases in which we have affirmed convictions for second-degree disorderly conduct based on "violent, tumultuous or threatening behavior."

In sum, no one wants to be confronted by an angry stranger, but not all angry behavior qualifies as disorderly conduct in the second degree. To support a finding that someone engaged in "violent, tumultuous, or threatening behavior," the evidence must be sufficient to establish either that the defendant actually used physical force or that the defendant engaged in physical conduct that was immediately likely to result in the defendant's use of physical force or, possibly, someone else's use of physical force. Speech may be considered only as circumstantial context for the defendant's physical conduct. Here, the evidence was insufficient to establish that defendant's physical conduct inside the bus met the legal standard. The court therefore erred in denying the MJOA on Count 1. Accordingly, we reverse defendant's conviction on Count 1, and we remand for entry of a conviction on Count 3.[5]

Conviction on Count 1 reversed; remanded for entry of a conviction on Count 3 and for resentencing; otherwise affirmed.

---

[5] As previously noted, defendant was found guilty on Count 3, but that verdict was merged with the guilty verdict on Count 1, resulting in a single conviction on Count 1. Count 3 was based on defendant's conduct outside the bus that prevented its departure for approximately 10 to 15 minutes, *i.e.*, standing in front of the bus and sitting on the bike rack. *See* ORS 166.116(1)(b) (a person commits IPT if a person "[i]ntentionally or knowingly interferes with the provision or use of public transportation services by, among other things, interfering with the movement of, or access to, public transit vehicles").